The **ELEKTRA RECORDS CO.**, a Division of Warner Communications, Inc., et al., Plaintiffs,

v.

**GEM ELECTRONIC DISTRIBUTORS, INC.**, et al., Defendants.

No. 73 C 772.

United States District Court, E. D. New York.

June 29, 1973.

Laporte & Meyers, by Ernest S. Meyers, New York City, for plaintiffs.

Jaspan & Kaplan, by A. Thomas Levin, Garden City, N. Y., for defendants.

## MEMORANDUM DECISION AND ORDER

NEAHER, District Judge.

In this action claiming infringement of copyrighted sound recordings, plaintiffs have moved for a preliminary injunction restraining further infringement and defendants have cross-moved to vacate a writ of seizure previously issued by this court and to recover all property seized thereunder. For the reasons which follow, plaintiffs are granted a preliminary injunction to the extent hereinafter indicated and defendants are granted return of the seized property subject to the terms of the injunction.

A new electronic invention, the "Make-A-Tape" system, has engendered this action. Make-A-Tape is a coin-operated magnetic tape duplicating system which can in two minutes reproduce on a blank 8-track cartridge the complete musical selections or other performances already recorded on another 8-track tape cartridge that takes 35 to 45 minutes to play. Plaintiffs, alleging violations by defendants of the Copyright Act, 17 U. S.C. § 1 et seq. ("the Act"),[1] sue pri-

---

1. 17 U.S.C. § 1(f) provides:

"Any person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right:

\* \* \* \* \*

"(f) To reproduce and distribute to the public by sale or other transfer of ownership, or by rental, lease, or lending, reproductions of the copyrighted work if it be a sound recording: *Provided,* That the exclusive right of the owner of a copyright in a sound recording to reproduce it is limited to the right to duplicate the sound recording in a tangible form 'that directly or indirectly recaptures the actual sounds fixed in the recording: *Provided further,* That this right does not extend to the making or duplication of another sound recording that is an independent fixation of other sounds, even

marily to restrain defendants' use of Make-A-Tape systems to produce for customers unauthorized copies of plaintiffs' copyrighted sound recordings. Jurisdiction is grounded on 28 U.S.C. § 1338(a).

On May 30, 1973, on plaintiffs' *ex parte* application, the court issued a temporary restraining order and order to show cause why a preliminary injunction should not be granted and at the same time ordered issuance of a writ for the seizure and impoundment of defendants' Make-A-Tape systems and related articles upon plaintiffs' posting security in the amount of $65,000. The writ was executed on June 6, 1973 and a hearing on the order to show cause and cross-motion was held on June 11.

The following material facts are not in dispute. Plaintiffs are three corporations engaged in the production and publication of sound recordings. They have published in tape cartridge form a number of popular musical sound recordings with notice of copyright, have been sole proprietors of all rights in the recordings since publication, have received certificates of registration for these recordings from the Register of Copyrights and have duly complied with all pertinent provisions of the Act and all other laws governing copyright as to the recordings. The validity of these copyrights is not in issue.

Defendants are Gem Electronic Distributors, Inc., of Farmingdale, New York, and ten of its fifteen retail stores which are located in this district. These stores sell electronic equipment and supplies including both blank and pre-recorded tapes and cartridges. They have also installed Make-A-Tape systems in their store premises and as of June 6, 1973, the date of seizure, ten such systems were in operation. Each of the Make-A-Tape systems has a market value in excess of $3,000 and defendants claim their continued detention under the writ of seizure "will deprive defendants of substantial use and profit."[2]

It is defendants' use of the Make-A-Tape claimed to infringe upon plaintiffs' copyrights to the latter's continuing damage which is here under attack. While the parties are in dispute as to the role of defendants' store employees in their operation,[3] plaintiffs have documented a sufficiently clear prima facie invasion of their exclusive rights and consequent irreparable harm to warrant preliminary injunctive relief. Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2 Cir. 1969); cf. Robert Stigwood Group Ltd. v. Sperber, 457 F.2d 50, 55 (2 Cir. 1972); American Metropolitan Enterprises of New York, Inc. v. Warner Bros. Records, Inc., 389 F.2d 903, 905 (2 Cir. 1968); Uneeda Doll Co., Inc. v. Goldfarb Novelty Co., Inc., 373 F.2d 851, 852 n. 1 (2 Cir. 1967); Joshua Meier Co., Inc. v. Albany Novelty Mfg. Co., 236 F.2d 144, 146–147 (2 Cir. 1956).

The court finds that on 14 separate occasions on specific dates between March 7 and April 17, 1973 at least

though such sounds imitate or simulate those in the copyrighted sound recording; or to reproductions made by transmitting organizations exclusively for their own use."

2. Affidavit of Charles Fine, defendants' Treasurer, dated June 18, 1973, in opposition to preliminary injunctive relief and in support of return of seized Make-A-Tapes (hereinafter "Fine Aff.").

3. Plaintiffs' affidavits aver that defendants' employees, in addition to selling blank tapes and supplying copyrighted tapes from store libraries, clean the machines before use, place the blank and pre-recorded tapes in the machine, extract the tapes after duplication, and test the newly-recorded tape for fidelity before delivery to the customer. Supporting Affidavits of Barry I. Slotnick and Bruce C. Butcher, Esqs., both dated May 7, 1973 (hereinafter "Slotnick and Butcher Affs.").

Defendants maintain that Gem employees ordinarily do not participate in the operation of the Make-A-Tape machines and that the customer ordinarily operates the system, asserting that the activities plaintiffs aver "are apparently the result of requests by the plaintiffs' agents for assistance in using the Make-A-Tape machine" (Fine Aff., par. 7).

eight of plaintiffs' copyrighted musical sound recordings were copied on Make-A-Tapes installed in defendants' stores in Kings, Queens, Nassau and Suffolk Counties. In each instance the copies were made on 8-track blank tape cartridges purchased at defendants' stores by representatives of plaintiffs posing as customers. Defendants' sales slips issued to the purchasers included in the selling price of the blank tapes the 50 cents in coin required to activate the Make-A-Tapes. The purchaser's choice of a copyrighted recording to be copied was made from a catalog or card file maintained in defendants' stores listing hundreds of popular sound recordings and artists. Numbers so chosen were then selected by an employee from the store inventory of labelled copyrighted sound recording tapes which included numbers published by the plaintiffs. The original wrappings had been removed from the pre-recorded tapes indicating they were not maintained in store inventory for resale. The retail value of plaintiffs' recordings is $6.00 per tape. The exact copies reproduced on the Make-A-Tape cost the purchasers from $1.49 to $1.99 apiece.[4]

Regardless of the precise role played by defendants' employees, the above-described operation of the Make-A-Tapes clearly evidences their commercial exploitation by defendants for profit in derogation of plaintiffs' rights of exclusive publication.[5] Although but a few instances of infringement are necessarily shown in plaintiffs' affidavits, the daily operation of the Make-A-Tapes in ten stores serving a four-county area containing over 7,000,000 population would very probably make substantial inroads upon plaintiffs' sales and profits from its copyright tapes, if defendants' use is not restrained.[6] Defendants assert they display and sell pre-recorded tapes and cartridges (Fine Aff., par. 4); but they also sell blank tapes and cartridges—a business very likely to be enhanced to plaintiffs' irreparable injury if the unauthorized and infringing use of the Make-A-Tape continues.

In sum, plaintiffs have demonstrated a strong likelihood of success on the merits and the probability of irreparable damage far outweighing any harm to defendants. It was just such findings and conclusions with respect to the operation and effect of the Make-A-Tape which prompted preliminary injunctive relief in Columbia Broadcasting System, Inc. v. Commercial Music Service Co., Civil Action 73–134 (S.D.Ohio, May 8, 1973), a case directly on point. There, as here,

> [t]he defendant has permitted unauthorized reproductions of plaintiffs' copyrighted tapes in its stores. The Court believes that this activity infringes plaintiffs' copyrights. The defendant contends that its activities fall within several of the recognized exceptions to the copyright act. However, the Court has not been convinced that any of these exceptions are applicable to the case at bar. *Id.*, p. 5.

---

4. These fact findings are amply supported by the copyright registration exhibits annexed to the complaint and the Supporting Affidavits of Slotnick and Butcher, together with documentary exhibits made part of such affidavits.

5. The profit-making aspect of the Make-A-Tape system is emphasized in the manufacturer's advertising directed to dealers as follows:
    "In a matter of seconds your customer can have a complete copy of the original, with the same quality of the original, for half the cost of the original." (Slotnick Aff., par. 3, Exh. 21.)

6. Plaintiffs point out that in addition to large sums invested for the production and promotion of their sound recordings, they are also liable upon the sale of records and tapes to pay royalties to performing artists and fees to welfare and pension funds of the American Federation of Musicians and the American Federation of Television and Radio Artists. Any diminution of these payments, they say, could well disturb present and future contractual relationships with the performing artists.

As in *Columbia Broadcasting, supra,* defendants here chiefly contend that their use of Make-A-Tape is not within the scope of the Act, attempting to distinguish it from the "tape piracy operations which were the object of the 1971 amendment to the Copyright Act. . . ." [7] They basically emphasize two factors: (a) individual rather than mass-duplication; (b) self-service rather than active reproduction, comparing the Make-A-Tape to a photocopy machine in a public library.[8]

Section 1(f) of the Act, *supra* n. 1, enacted in 1971 as P.L. 92–140, sought to create a limited copyright in sound recordings and to make unlawful the unauthorized reproduction and sale of copyrighted sound recordings. It also subjected all persons engaging in the unauthorized use of copyrighted musical works in records to all the provisions dealing with infringements of copyrights. H.R. 92–487, 1971, U.S.Code Cong. & Admin.News, at p. 1567. The House Report accompanying the bill, as well as hearings before Subcommittee No. 3 of the House Judiciary Committee, reveals that Congress was particularly concerned with combatting extensive pirating of phonograph records and tapes and clearly did not intend to extend coverage of the bill to at least two types of usages of protected recordings: (1) library uses [9] and (2) home recordings.[10]

Defendants, focussing on the claimed individual and self-service nature of a Make-A-Tape duplication, compare it to a photocopier in a public library. That comparison is invalid for these obvious reasons: (1) Use of a photocopier generally involves duplication of only a portion of a given book or other copyable matter. The Make-A-Tape system duplicates an entire tape, not just part of it. (2) Ordinarily a photocopier would not be used to reproduce an entire book because of the time entailed and a cost in excess of the price of the book. The Make-A-Tape system results in a duplicated tape in less than two minutes and at less cost than the original. (3) The photocopied item is a copy different in form from the original and hence less desirable. The duplicated tape is a true copy essentially identical and equally desirable.

Defendants' public library analogy is flawed in another respect. A public library makes books and other printed matter available on an altruistic basis and provides a photocopier as a service to assist users. Defendants are clearly not non-profit institutions and, despite free tape loans from their libraries, manifestly utilize the Make-A-Tape as a further source of income, both in the service charge for duplication and in the sale of blank tapes. Indeed they argue that a grant of a preliminary injunction "would effectively close down a portion of defendants' business and . . . would cause substantial harm to defendants." [11]

Defendants fare no better with their reliance on the "home recording" exception provided in § 1(f), *supra* n. 10. That exception does not cover situations where the copying is done for the "purpose of reproducing or otherwise capitalizing commercially on it." House Report No. 92–487, U.S.Code Cong. & Admin.News, *supra* at p. 1572. The facts of record here bespeak commercial exploitation and nothing else. In lending

---

7. Defendants' Memorandum of Law, at 10.

8. Defendants' Memorandum of Law, at 9.

9. "It is not the intention [of the Committee] that the limitations on lending or renting contained in proposed new Section 1(f) reach out to apply to [the lending of sound recordings] by non-profit libraries." (1971 U.S.Code Cong. & Admin.News, at p. 1572.)

10. "[I]t is not the intention of the Committee to restrain the home recording from broadcasts or from tapes or records, of recorded performances, where the home recording is for private use and with no purpose of reproducing or otherwise capitalizing on it." (*Id.*)

11. Defendants' Memorandum of Law, at 9.

the copyrighted sound recording to the customer without charge, in selling the less costly blank tape from which the spurious but exact copy may be made, and in providing the equipment whereby it may be speedily done at minimal cost, defendants are engaging in mass piracy on a custom basis. To view this activity as a form of "home recording" would stretch imagination to the snapping point. To refuse to protect plaintiffs' exclusive reproduction and publication rights in such circumstances would defeat the very purpose of the sound recording amendment and nullify the intent of Congress.

Accordingly, plaintiffs are entitled to a preliminary injunction which shall be binding upon defendants and others as provided in Rule 65(d), F.R.Civ.P., and shall restrain defendants pending the determination of this action from:

1. Using or permitting the use of Make-A-Tape systems installed in defendants' stores for the purpose of making copies of tape sound recordings as to which plaintiffs have enforceable copyrights.

2. Offering to or permitting the use by customers of copyrighted sound recordings of plaintiffs maintained in defendants' stores for the purpose of making copies on Make-A-Tape systems installed in such stores.

The foregoing preliminary injunction shall become effective upon the giving of security by plaintiffs in the aggregate amount of $10,000.

The court also finds merit in defendants' application for return of the Make-A-Tape systems and related parts heretofore seized. Return of such property to defendants is therefore ordered, subject to the aforesaid preliminary injunction.

The foregoing constitutes the findings of fact and conclusions of law of the court for purposes of Rule 52, F.R.Civ.P.

So ordered.