JACOBS, Circuit Judge:
*173 In this copyright infringement suit, defendant TVEyes, Inc. ("TVEyes") offers a service that enables its clients to easily locate and view segments of televised video programming that are responsive to the clients' interests. It does so by continuously recording vast quantities of television programming, compiling the recorded broadcasts into a database that is text-searchable (based primarily on the closed-captioned text copied from the broadcasts), and allowing its clients to search for and watch (up to) ten-minute video clips that *174 mention terms of interest to the clients.[1] Plaintiff Fox News Network, LLC ("Fox"), which has sued TVEyes in the United States District Court for the Southern District of New York, does not challenge the creation of the text-searchable database but alleges that TVEyes infringed Fox's copyrights by re-distributing Fox's copied audiovisual content, thereby enabling TVEyes's clients to access that content without Fox's permission. The principal question on appeal is whether TVEyes's enabling of its clients to watch Fox's programming is protected by the doctrine of fair use. See 17 U.S.C. § 107.
The district court held that fewer than all of the functions of TVEyes's service constitute a fair use. Specifically, the district court deemed a fair use the functions enabling clients of TVEyes to search for videos by term, to watch the resulting videos, and to archive the videos on the TVEyes servers; but the court held that certain other functions were not a fair use, such as those enabling TVEyes's clients to download videos to their computers, to freely e-mail videos to others, or to watch videos after searching for them by date, time, and channel (rather than by keyword). The district court therefore dismissed Fox's challenge to important functions of TVEyes's service, but also held that TVEyes was liable to Fox for copyright infringement on account of other functions of that service. A permanent injunction limited various aspects of TVEyes's service.[2]
This appeal shares features with our decision in Authors Guild v. Google, Inc., 804 F.3d 202 (2d Cir. 2015) (" Google Books"). That case held that Google's creation of a text-searchable database of millions of books (including books under copyright) was a fair use because Google's service was "transformative" and because integral features protected the rights of copyright holders. However, we cautioned that the case "test[ed] the boundaries of fair use." Google Books, 804 F.3d at 206. We conclude that defendant TVEyes has exceeded those bounds.
TVEyes's re-distribution of Fox's audiovisual content serves a transformative purpose in that it enables TVEyes's clients to isolate from the vast corpus of Fox's content the material that is responsive to their interests, and to access that material in a convenient manner. But because that re-distribution makes available virtually all of Fox's copyrighted audiovisual content-including all of the Fox content that TVEyes's clients wish to see and hear-and because it deprives Fox of revenue that properly belongs to the copyright holder, TVEyes has failed to show that the product it offers to its clients can be justified as a fair use.
Accordingly, we reverse the order of the district court to the extent it held that some of the challenged TVEyes functions constituted a fair use. We affirm the order to the extent that it denied TVEyes's request for additional relief. Furthermore, because the district court's issuance of an injunction was premised on the incorrect conclusion that much of what TVEyes offered was a fair use, we remand for the district court to revise the injunction in light of this opinion.
I
TVEyes is a for-profit media company. It offers a service that allows its clients to *175 efficiently sort through vast quantities of television content in order to find clips that discuss items of interest to them. For example, a client in marketing or public relations interested in how a particular product is faring in the media can use the TVEyes service to find, watch, and share clips of recent television broadcasts that mention that product.
The service works this way. TVEyes records essentially all television broadcasts as they happen, drawing from more than 1,400 channels, recording 24 hours a day, every day. By copying the closed-captioned text that accompanies the content it records (and utilizing speech-to-text software when necessary), TVEyes creates a text-searchable transcript of the words spoken in each video. The videos and transcripts are consolidated into a database. A client inputs a search term and gets a list of video clips that mention the term. A click on a thumbnail image of a clip plays the video, beginning fourteen seconds before the search term was spoken, and displays a segment of the transcript with the search term highlighted. The parties dispute the quality of the clips. Fox contends that the clips are high definition; TVEyes contends that the clips are grainier than the original broadcasts. The clips can be played for no more than ten minutes, but a user can play an unlimited number of clips. To prevent clients from watching entire programs, TVEyes (during the course of this litigation) implemented a device that is claimed to prevent clients from viewing consecutive segments. The parties dispute whether this measure is effective.
TVEyes's service has ancillary functions. A TVEyes client may "archive" videos permanently on the TVEyes servers and may download videos directly to the client's computer. These services are useful because TVEyes otherwise deletes captured content after thirty-two days. Clients can also email the clips for viewing by others, including those who are not TVEyes clients. And clients can search for videos by date, time, and channel (rather than by keyword). The parties dispute whether clients can watch live broadcasts on TVEyes.
A TVEyes subscription costs approximately $500 per month, is available for business and professional use, and is not offered to private consumers for personal use. Clients include journalists, government and political organizations, law enforcement, the military, for-profit companies, and non-profits.
TVEyes asserts that it restricts its clients' use of its content in various ways. For example, clients are required to sign a contract that limits their use of clips to "internal purposes only" and are warned upon downloading a clip that it is to be used for only "internal review, analysis or research." Fox contends that these safeguards are ineffective and disputes the assertion by TVEyes that its service is primarily used for "internal" research and analysis.
Fox claims that at some point TVEyes unsuccessfully approached it to procure a license to use Fox programming. Fox demanded that TVEyes stop using its programming; when TVEyes refused, litigation ensued. The lawsuit focuses on nineteen copyrighted Fox broadcasts. The legal question is whether TVEyes has a "fair use" defense to Fox's copyright infringement claims. 17 U.S.C. § 107.
II
The Copyright Act provides:
[T]he fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching ..., scholarship, or research, is not an infringement *176 of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include-
(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
(2) the nature of the copyrighted work;
(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
(4) the effect of the use upon the potential market for or value of the copyrighted work.
Id.
In fair use litigation, courts undertake a "case-by-case analysis" in which each factor is considered, "and the results [are] weighed together, in light of the purposes of copyright." Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577-78, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994). The factors are non-exclusive, but consideration of each is mandatory.[3] Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P., 756 F.3d 73, 81 (2d Cir. 2014). Some of the factors are more important than others, with the fourth (market impact) being "the single most important element." Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 566, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). Fair use is an affirmative defense, so TVEyes bears the burden of proving it. Am. Geophysical Union v. Texaco, Inc., 60 F.3d 913, 918 (2d Cir. 1994).
It is useful to analyze separately distinct functions of the secondary use (i.e., the use by TVEyes of Fox's copyrighted material), considering whether each independent function is a fair use. See Google Books, 804 F.3d at 216-18. TVEyes has two core offerings: the "Search function" and the "Watch function." The Search function allows clients to identify videos that contain keywords of interest. The Watch function allows TVEyes clients to view up to ten-minute, unaltered video clips of copyrighted content. Fox does not challenge the Search function on appeal. Fox's challenge is to the Watch function, and we determine that its inclusion renders TVEyes's package of services unprotected by the fair use doctrine. That conclusion subsumes and obviates consideration of certain functions that are subsidiary to the Watch function, such as archiving, downloading, and emailing the video clips.
Turning to the Watch function, we next consider each of the four factors listed in § 107.
A
In considering the first statutory factor-the "purpose and character" of the secondary use, 17 U.S.C. § 107(1) -the primary inquiry is whether the use "communicates something new and different from the original or [otherwise] expands its utility," that is, whether the use is "transformative." Google Books, 804 F.3d at 214. To be transformative, a use must "do[ ] something more than repackage or republish the original copyrighted work"; it must " 'add[ ] something new, with a further purpose or different character, altering the first with new expression, meaning or message....' " Authors Guild, Inc. v. HathiTrust, 755 F.3d 87, 96 (2d Cir. 2014) (quoting *177 Campbell, 510 U.S. at 579, 114 S.Ct. 1164 ). "Although ... transformative use is not absolutely necessary for a finding of fair use, ... [transformative] works ... lie at the heart of the fair use doctrine," Campbell, 510 U.S. at 579, 114 S.Ct. 1164, and "a use of copyrighted material that 'merely repackages or republishes the original' is unlikely to be deemed a fair use," Infinity Broad. Corp. v. Kirkwood, 150 F.3d 104, 108 (2d Cir. 1998) (quoting Pierre N. Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105, 1111 (1990) ).
Precedent is helpful. Both parties rely most heavily on Google Books, which provides the starting point for analysis.
In Google Books, a consortium of libraries collaborated to make digital copies of millions of books, many of them under copyright. Google pooled these digital copies into a text-searchable database. 804 F.3d at 207. Anyone could search the database free. When a user entered a search term, Google returned a list of books that included the term, and, for each responsive book, Google provided a few "snippets" that contained the term. Id.
We held that Google's copying served a transformative purpose because it created a text-searchable database that "communicate[d] something new and different from the original." Id. at 214. "[T]he result of a word search is different in purpose, character, expression, meaning, and message from the page (and the book) from which it is drawn." Id. at 217 (quoting HathiTrust, 755 F.3d at 97 ).
We also held that the "snippet view" of unaltered, copyrighted text "add[ed] important value to the basic transformative search function" by allowing users to verify that the list of books returned by the database was responsive to the user's search. Id. Thus, a user searching for the term "Hindenburg" could infer from snippets whether the book was referencing the Weimar president or the exploded zeppelin. See ids="4064297" index="29" url="https://cite.case.law/f3d/755/87/#p96">id. at 217-18.
TVEyes's copying of Fox's content for use in the Watch function is similarly transformative insofar as it enables users to isolate, from an ocean of programming, material that is responsive to their interests and needs, and to access that material with targeted precision. It enables nearly instant access to a subset of material-and to information about the material-that would otherwise be irretrievable, or else retrievable only through prohibitively inconvenient or inefficient means.
Sony Corporation of America vs. Universal City Studios, Inc. is instructive. See 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). In Sony, a television customer, who (by virtue of owning a television set) had acquired authorization to watch a program when it was broadcast, recorded it in order to watch it instead at a later, more convenient time. That was held to be a fair use. While Sony was decided before "transformative" became a term of art, the apparent reasoning was that a secondary use may be a fair use if it utilizes technology to achieve the transformative purpose of improving the efficiency of delivering content without unreasonably encroaching on the commercial entitlements of the rights holder.
The Watch function certainly qualifies as technology that achieves the transformative purpose of enhancing efficiency: it enables TVEyes's clients to view all of the Fox programming that (over the prior thirty-two days) discussed a particular topic of interest to them, without having to monitor thirty-two days of programming in order to catch each relevant discussion; and it eliminates the clients' need even to view entire programs, because the ten most relevant minutes are presented to them. Much like the television customer in *178 Sony, TVEyes clients can view the Fox programming they want at a time and place that is convenient to them, rather than at the time and place of broadcast. For these reasons, TVEyes's Watch function is at least somewhat transformative.[4]
* * *
The first statutory factor also implicates considerations distinct from whether the secondary use is transformative. In particular, Fox argues that the "commercial nature" of TVEyes's copying (its sale of access to Fox's content) weighs against a finding of fair use. 17 U.S.C. § 107(1).
The commercial nature of a secondary use weighs against a finding of fair use. See Campbell, 510 U.S. at 585, 114 S.Ct. 1164. And it does so especially when, as here, the transformative character of the secondary use is modest. See ids="234489" index="36" url="https://cite.case.law/us/510/569/#p577">id. at 579, 114 S.Ct. 1164 ("[T]he [less] transformative the new work, the [more] will be the significance of other factors, like commercialism...."). The Watch function has only a modest transformative character because, notwithstanding the transformative manner in which it delivers content, it essentially republishes that content unaltered from its original form, with no "new expression, meaning or message." HathiTrust, 755 F.3d at 96 (quoting Campbell, 510 U.S. at 579, 114 S.Ct. 1164 ); cf. Kirkwood, 150 F.3d at 106 (service that transmits unaltered radio broadcasts in real time over telephone lines is not transformative); Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 342 F.3d 191, 199-200 (3d Cir. 2003) (service that streams short previews of movies without commentary is not transformative). The clients of TVEyes use Fox's news broadcasts for the same purpose that authorized Fox viewers use those broadcasts-the purpose of learning the information reported.
The first statutory factor therefore favors TVEyes, albeit slightly.
B
The second statutory factor is "the nature of the copyrighted work." 17 U.S.C. § 107(2). This factor "has rarely played a significant role in the determination of a fair use dispute," and it plays no significant role here. Google Books, 804 F.3d at 220.
TVEyes presses the argument that, since facts are not copyrightable, the factual nature of Fox's content militates in favor of a finding of fair use. We have rejected this argument: "Those who report the news undoubtedly create factual works. It cannot seriously be argued that, for that reason, others may freely copy and re-disseminate news reports." Id. at 220.
C
The third statutory factor is "the amount and substantiality of the portion *179 used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). The relevant consideration is the amount of copyrighted material made available to the public rather than the amount of material used by the copier. Google Books, 804 F.3d at 222.
This factor clearly favors Fox because TVEyes makes available virtually the entirety of the Fox programming that TVEyes users want to see and hear. While "courts have rejected any categorical rule that a copying of the entirety cannot be a fair use," "a finding of fair use is [less] likely ... when the copying is extensive, or encompasses the most important parts of the original." Id. at 221. In this respect, the TVEyes Watch function is radically dissimilar to the service at issue in Google Books.
Google's snippet function was designed to ensure that users could see only a very small piece of a book's contents. Each snippet was three lines of text, constituting approximately one-eighth of a page; a viewer could see at most three snippets per book for any searched term, and no more than one per page. Users were prevented from performing repeated searches to find multiple snippets that could be compiled into a coherent block of text. Approximately 22% of a book's text was "blacklist[ed]": no snippet could be shown from those pages. Id. at 222. And snippets were not available at all for such books as dictionaries or cookbooks, in which a snippet might convey all the information that a searcher was likely to need. While the snippets allowed a user to judge whether a book was responsive to the user's needs, they were abbreviated to ensure that it would be nearly impossible for a user to see a meaningful exposition of what the author originally intended to convey to readers.
TVEyes redistributes Fox's news programming in ten-minute clips, which-given the brevity of the average news segment on a particular topic-likely provide TVEyes's users with all of the Fox programming that they seek and the entirety of the message conveyed by Fox to authorized viewers of the original. Cf. Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 564-65, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (finding no fair use when the copying involved only about 300 words, but the portion copied was "the heart of the book"). TVEyes's use of Fox's content is therefore both "extensive" and inclusive of all that is "important" from the copyrighted work. Google Books, 804 F.3d at 221.
D
The fourth statutory factor is "the effect of the [secondary] use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor is "undoubtedly the single most important element of fair use." Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 566, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). It "focuses on whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original." Google Books, 804 F.3d at 223. Critically, it requires consideration of "not only the ... market harm caused by the particular actions of the alleged infringer," but also the market harm that would result from "unrestricted and widespread conduct of the [same] sort." Campbell, 510 U.S. at 590, 114 S.Ct. 1164 (internal quotation marks and alteration omitted).
TVEyes argues that its service poses little risk of being a "competing substitute" for Fox's offerings.
*180 Google Books, 804 F.3d at 223. Fox argues that TVEyes undercuts Fox's ability to profit from licensing searchable access to its copyrighted content to third parties. Fox has much the stronger point.
"It is indisputable that, as a general matter, a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work, and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor." Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 614 (2d Cir. 2006) (quoting Texaco, 60 F.3d at 929 ). However, "not every effect on potential licensing revenues enters the analysis under the fourth factor." Texaco, 60 F.3d at 929. A copyright owner has no right to demand that users take a license unless the use that would be made is one that would otherwise infringe an exclusive right. See Bill Graham Archives, 448 F.3d at 615. Even if a use does infringe an exclusive right, "[o]nly an impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets should be legally cognizable when evaluating a secondary use's effect upon the potential market for or value of the copyrighted work." Texaco, 60 F.3d at 930 (internal quotation marks omitted).
That limitation does not restrict our analysis here. The success of the TVEyes business model demonstrates that deep-pocketed consumers are willing to pay well for a service that allows them to search for and view selected television clips, and that this market is worth millions of dollars in the aggregate. Consequently, there is a plausibly exploitable market for such access to televised content, and it is proper to consider whether TVEyes displaces potential Fox revenues when TVEyes allows its clients to watch Fox's copyrighted content without Fox's permission.
Such displacement does occur. Since the ability to re-distribute Fox's content in the manner that TVEyes does is clearly of value to TVEyes, it (or a similar service) should be willing to pay Fox for the right to offer the content. By providing Fox's content to TVEyes clients without payment to Fox, TVEyes is in effect depriving Fox of licensing revenues from TVEyes or from similar entities. And Fox itself might wish to exploit the market for such a service rather than license it to others. TVEyes has thus "usurp[ed] a market that properly belongs to the copyright-holder." Kirkwood, 150 F.3d at 110. It is of no moment that TVEyes allegedly approached Fox for a license but was rebuffed: the failure to strike a deal satisfactory to both parties does not give TVEyes the right to copy Fox's copyrighted material without payment.
In short, by selling access to Fox's audiovisual content without a license, TVEyes deprives Fox of revenues to which Fox is entitled as the copyright holder. Therefore, the fourth factor favors Fox.
E
To ascertain whether TVEyes's service is protected as a fair use, the final step is to weigh the four statutory factors together, along with any other relevant considerations. The factors should not be "treated in isolation, one from another"; rather, "[a]ll are to be explored, and the results [are to be] weighed together, in light of the purposes of copyright." Campbell, 510 U.S. at 577-78, 114 S.Ct. 1164. While the factors are not exclusive, in this case they provide sufficient guidance. See Kirkwood, 150 F.3d at 111.
We conclude that TVEyes's service is not justifiable as a fair use. As to the first factor, TVEyes's Watch function is at least somewhat transformative in that it renders convenient and efficient access to a subset *181 of content; however, because the function does little if anything to change the content itself or the purpose for which the content is used, its transformative character is modest at best. Accordingly-and because the service at issue is commercial-the first factor favors TVEyes only slightly. The second factor is neutral in this case. The third factor strongly favors Fox because the Watch function allows TVEyes's clients to see and hear virtually all of the Fox programming that they wish. And the fourth factor favors Fox as well because TVEyes has usurped a function for which Fox is entitled to demand compensation under a licensing agreement.
At bottom, TVEyes is unlawfully profiting off the work of others by commercially re-distributing all of that work that a viewer wishes to use, without payment or license. Having weighed the required factors, we conclude that the balance strongly favors Fox and defeats the defense of fair use.
III
TVEyes challenges the district court's conclusion that it is liable to Fox under a theory of direct copyright infringement.[5] A direct infringer exercises "volitional conduct" to make the infringing copy. Cartoon Network LP, LLLP v. CSC Holdings, Inc. ("Cablevision"), 536 F.3d 121, 131 (2d Cir. 2008). The conduct at issue in Cablevision was non-volitional; however, it bears no resemblance to what TVEyes does. The Cablevision defendant provided a remote DVR service similar to the recording capability of a DVR in a television viewer's home. Unless the subscriber chose to record a program, it remained on the defendant's server for no more than .1 second. See ids="5763960" index="72" url="https://cite.case.law/f3d/536/121/#p131">id. at 124-25. By contrast, TVEyes decides what audiovisual content to record, copies that content, and retains it for thirty-two days. And this copying, at least to the extent that it is done to enable the Watch function, is an infringement. Volitional conduct that infringes is clear.
IV
The district court issued a permanent injunction prohibiting TVEyes from enabling its clients to download clips of Fox's programming or to search for such clips by date and time; the court also imposed restrictions on TVEyes's enabling of its clients to email clips or to post them to social media sites. We review the issuance of a permanent injunction "for abuse of discretion, which may be found where the Court, in issuing the injunction, relied on ... an error of law." S.C. Johnson & Son, Inc. v. Clorox Co., 241 F.3d 232, 237 (2d Cir. 2001) (quoting Knox v. Salinas, 193 F.3d 123, 128-29 (2d Cir. 1999) (per curiam) ).
The district court's injunction was shaped by an error of law: the mistaken assumption that the Watch function (and some features subsidiary to it) had fair-use protection. We therefore remand to the district court to revise the injunction in accordance with this opinion.
Because the product TVEyes currently offers includes the infringing Watch function and its subsidiary features (i.e., clients' ability to archive, download, and email clips, as well as to view clips after *182 conducting a date/time search[6] ), the court should enjoin TVEyes from offering that product. However, because Fox does not dispute TVEyes's right to offer its Search function, the court's injunction shall not bar TVEyes from offering a product that includes that function without making impermissible use of any protected audiovisual content.[7]
CONCLUSION
The order of the district court is reversed to the extent it held that TVEyes's product was a fair use. The order is affirmed to the extent it denied TVEyes's request for additional relief. We remand for the district court to revise the injunction to conform with this opinion. Any further appeal will be assigned to this panel.

TVEyes also captures radio content. For simplicity, this opinion will focus on only television broadcasts.

Fox does not challenge on appeal the dismissal (on summary judgment) of its claims alleging "hot news" misappropriation and "direct competition" misappropriation.

Pace Judge Kaplan's argument that our discussion of transformative use (which is integral to the first statutory factor) should be omitted from the fair-use analysis-or be deemed dicta. Whether the majority opinion's discussion "may contribute to confusion and uncertainty" (Concurring Op. at 183) is not for me to say.

TVEyes argues that the Watch function is transformative because it allows clients to conduct research and analysis of television content by enabling them to view clips responsive to their research needs. Research, TVEyes argues, is a purpose not shared by users of the original content. This argument proves too much.
That a secondary use can facilitate research does not itself support a finding that the secondary use is transformative. See American Geophysical Union v. Texaco, Inc., 60 F.3d 913 (2d Cir. 1994). In Texaco, a company was allowing each of its 400 to 500 scientists to photocopy journal articles pertinent to their individual research projects, thus enabling three subscriptions to service the needs of hundreds of scientists. Id. at 915-16. We stated that if copying were deemed transformative "simply because [it was done] in the course of doing research," then "the concept of a 'transformative' use would be extended beyond recognition." Id. at 924.

A party that has not committed direct copyright infringement may still be liable under the doctrine of contributory infringement, which allows a defendant to be held liable for infringing acts of third parties. See Sony, 464 U.S. at 435, 104 S.Ct. 774 ; Arista Records, LLC v. Doe 3, 604 F.3d 110, 117-18 (2d Cir. 2010). Fox asserted liability only on the ground of direct infringement, so we do not consider contributory infringement.

There is no copyright infringement in the use of the date/time search function to discover the particular program that was playing on a certain channel at a certain time. That information is a historical fact, which is not copyrightable. See Arica Institute, Inc. v. Palmer, 970 F.2d 1067, 1075 (2d Cir. 1992). However, enabling a client to view a copied video located on the basis of a date/time search can constitute infringement, and it is not a fair use.

Because Fox has not challenged the Search function on this appeal, and the parties have therefore presented no arguments about it, we express no views on it, neither upholding nor rejecting it.