Capitol Records, LLC et. al. v. ReDigi Inc., et. al.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2017

(Argued: August 22, 2017         Decided: December 12, 2018)

Docket No. 16-2321

_____

Capitol Records, LLC, Capitol Christian Music Group, Inc., Virgin Records IR Holdings, Inc.,

*Plaintiffs-Appellees*,

v.

ReDigi Inc., John Ossenmacher, Larry Rudolph, AKA Lawrence S. Rogel,

*Defendants-Appellants*.

_____

Before:

JON O. NEWMAN, PIERRE N. LEVAL, and ROSEMARY S. POOLER,

*Circuit Judges*.

Defendants, ReDigi Inc. and related persons, appeal from the grant of partial summary judgment and stipulated final judgment by the United States District Court for the Southern District of New York (Richard J. Sullivan, *J.*) in favor of Plaintiffs, record companies whose copyrighted sound recordings were resold through the ReDigi platform. The district court found copyright infringement. AFFIRMED.

> RICHARD S. MANDEL, New York,
> N.Y. (Jonathan Z. King, Cowan,
> Liebowitz & Latman, P.C., New York,
> N.Y., on the brief), *for Plaintiffs-Appellees*.

ROBERT C. WELSH, New York, N.Y. (C. Dennis Loomis, Baker & Hostetler LLP, Los Angeles, CA, on the brief) *for Defendant-Appellants*.

LEVAL, *Circuit Judge*:

Defendant ReDigi, Inc. and its founders, Defendants Larry Rudolph and John Ossenmacher,[1] appeal from the judgment of the United States District Court for the Southern District of New York (Richard J. Sullivan, *J.*) in favor of Plaintiffs, Capitol Records, LLC, Capitol Christian Music Group, Inc., and Virgin Records IR Holdings, Inc. ("Plaintiffs"), finding copyright infringement. Defendants had created an Internet platform designed to enable the lawful resale, under the first sale doctrine, of lawfully purchased digital music files, and had hosted resales of such files on the platform. The district court concluded that, notwithstanding the "first sale" doctrine, codified in the Copyright Act of 1976, 17 U.S.C. § 109(a), ReDigi's Internet system version 1.0 infringed the Plaintiffs' copyrights by enabling the resale of such digital files containing sound recordings of Plaintiffs' copyrighted music. We agree with the district court that ReDigi infringed the Plaintiffs' exclusive rights under 17

---

[1] Hereinafter "ReDigi" is used to designate all three Defendants, except where the context makes clear it refers solely to the company.

U.S.C. § 106(1) to reproduce their copyrighted works. We make no decision whether ReDigi also infringed the Plaintiffs' exclusive rights under 17 U.S.C. § 106(3) to distribute their works.[2]

BACKGROUND

I.      Facts

Plaintiffs are record companies, which own copyrights or licenses in sound recordings of musical performances. Plaintiffs distribute those sound recordings in numerous forms, of which the most familiar twenty years ago was the compact disc. Today, Plaintiffs also distribute their music in the form of digital files, which are sold to the public by authorized agent services, such as Apple iTunes, under license from Plaintiffs. Purchasers from the Apple iTunes online store download the files onto their personal computers or other devices.

ReDigi was founded by Defendants Ossenmacher and Rudolph in 2009 with the goal of creating enabling technology and providing a marketplace

---

[2] We do not adjudicate whether ReDigi's system version 2.0 infringed any of the Plaintiffs' rights as this question (although stipulated in the final judgment) was not litigated in the district court. Defendants stipulated that a judgment in Plaintiffs' favor would enjoin the Defendants, as well as all persons in specified relationships with the Defendants, such as their "officers, agents, servants, representatives . . . and licensees," from implementing version 2.0. Stipulated Final Judgment ¶5, *Capitol Records, LLC. V. ReDigi, Inc.*, No. 12-CV-95 (RJS), ECF No. 222 (S.D.N.Y. June 3, 2015).

for the lawful resale of lawfully purchased digital music files.[3] Ossenmacher served as ReDigi's Chief Executive Officer and Rudolph, who spent twelve years as a Principal Research Scientist at the Massachusetts Institute of Technology, served as ReDigi's Chief Technical Officer. During the period addressed by the operative complaint, ReDigi, through its system version 1.0, hosted resales of digital music files containing the Plaintiffs' music by persons who had lawfully purchased the files from iTunes.

Considering the evidence in the light most favorable to ReDigi, ReDigi's system version 1.0 operates as follows.

*1.* *Music Manager:* A person who owns a digital music file lawfully purchased from iTunes and intends to employ ReDigi's system to resell it (the "user") must first download and install onto her computer ReDigi's "Music Manager" software program ("Music Manager"). Once Music Manager has been installed, it analyzes the digital file intended for resale, verifies that the file was originally lawfully purchased from iTunes, and scans it for

---

[3] ReDigi was not making efforts in the shadows to infringe on copyrights. To the contrary, it invented a system designed in good faith to achieve a goal generally favored by the law of copyright, reasonably hoping the system would secure court approval as conforming to the demands of the Copyright Act.

indications of tampering. If the file was lawfully purchased, Music Manager deems it an "Eligible File" that may be resold.[4]

   *2.      Data Migration:*  The ReDigi user must then cause the file to be transferred to ReDigi's remote server, known as the "Cloud Locker." To effectuate this transfer, ReDigi developed a new method that functions differently from the conventional file transfer. The conventional process is to reproduce the digital file at the receiving destination so that, upon completion of the transfer, the file exists simultaneously on both the receiving device and on the device from which it was transferred. If connectivity is disrupted during such a standard transfer, the process can be repeated because the file remains intact on the sender's device.

   Under ReDigi's method—which it calls "data migration"—ReDigi's software "begins by breaking the [digital] music file into small 'blocks' [of data] of roughly four thousand bytes in length." Appellants Br. 24. Once the file has been broken into blocks of data ("packets"), ReDigi's system creates a "transitory copy" of each packet in the initial purchaser's computer buffer. *Id*.

---

[4] Music Manager will deem a file "Eligible" if it was purchased by the user from iTunes or it was purchased by the user through ReDigi, having been originally purchased lawfully by another from iTunes.

Upon copying (or "reading") a packet into the initial purchaser's computer buffer, ReDigi's software sends a command to delete that packet of the digital file from permanent storage on the initial purchaser's device. Rogel Decl. App'x 690-91. ReDigi's software then sends the packet to the ReDigi software to be copied into the buffer and deleted from the user's device. Rogel Decl. App'x 691. During the data migration process, the digital file cannot be accessed, played, or perceived. If connectivity is disrupted during the data migration process, the remnants of the digital file on the user's device are unusable, and the transfer cannot be re-initiated. In such circumstances, ReDigi (according to its brief) bears the cost of the user's loss. Appellants Br. 25.[5]

Once all the packets of the source file have been transferred to ReDigi's server, the Eligible File has been entirely removed from the user's device. The packets are then re-assembled into a complete, accessible, and playable file on ReDigi's server.

---

[5] It is unclear from the evidence cited in ReDigi's Rule 56.1 statement whether ReDigi purchases a new file from iTunes to effectuate resale, pays the user to offset the loss of her file, or otherwise bears the cost of the loss. *See* App'x 1489 at ¶ 35. These alternatives do not affect our decision.

ReDigi describes its primary technological innovation using the metaphor of a train (the digital file) leaving from one station (the original purchaser's device) and arriving at its destination (in the first instance, ReDigi's server). Under either the typical method or ReDigi's method, packets are sent sequentially, such that, conceptually, "each packet is a car" moving from the source to the destination device. App'x 657. Once all the packets arrive at the destination device, they are reassembled into a usable file. *Id.* At that moment, in a typical transfer, the entire digital file in usable form exists on both devices. *Id.* ReDigi's system differs in that it effectuates a deletion of each packet from the user's device immediately after the "transitory copy" of that packet arrives in the computer's buffer (before the packet is forwarded to ReDigi's server). In other words, as each packet "leaves the station," ReDigi deletes it from the original purchaser's device such that it "no longer exists" on that device. *Id.* As a result, the entire file never exists in two places at once. *Id.*

After the file has reached ReDigi's server but before it has been resold, the user may continue to listen to it by streaming audio from the user's Cloud

7

Locker on ReDigi's server. If the user later re-downloads the file from her Cloud Locker to her computer, ReDigi will delete the file from its own server.

3. *Resale:* Once an Eligible File has "migrated" to ReDigi's server, it can be resold by the user utilizing ReDigi's market function. If it is resold, ReDigi gives the new purchaser exclusive access to the file. ReDigi will (at the new purchaser's option) either download the file to the new purchaser's computer or other device (simultaneously deleting the file from its own server) or will retain the file in the new purchaser's Cloud Locker on ReDigi's server, from which the new purchaser can stream the music. ReDigi's terms of service state that digital media purchases may be streamed or downloaded only for personal use.

4. *Duplicates:* ReDigi purports to guard against a user's retention of duplicates of her digital music files after she sells the files through ReDigi. To that end, Music Manager continuously monitors the user's computer hard drive and connected devices to detect duplicates. When a user attempts to upload an Eligible File to ReDigi's server, ReDigi "prompt[s]" her to delete any pre-existing duplicates that Music Manager has detected. If ReDigi detects that the user has not deleted the duplicates, ReDigi blocks the upload

of the Eligible File. After an upload is complete, Music Manager continues to search the user's connected devices for duplicates. If it detects a duplicate of a previously uploaded Eligible File, ReDigi will prompt the user to authorize ReDigi to delete that duplicate from her personal device and, if authorization is not granted, it will suspend her account.

Plaintiffs point out, and ReDigi does not dispute, that these precautions do not *prevent* the retention of duplicates after resale through ReDigi. Suspension of the original purchaser's ReDigi account does not negate the fact that the original purchaser has both sold and retained the digital music file after she sold it. So long as the user retains previously-made duplicates on devices not linked to the computer that hosts Music Manager, Music Manager will not detect them. This means that a user could, prior to resale through ReDigi, store a duplicate on a compact disc, thumb drive, or third-party cloud service unconnected to the computer that hosts Music Manager and access that duplicate post-resale.[6] While ReDigi's suspension of the original

---

[6] Defendants do not dispute that, under Apple iCloud's present arrangements, a user could sell her digital music files on ReDigi, delete Music Manager, and then redownload the same files to her computer for free from the Apple iCloud. Apple's iCloud service allows one who has purchased a file from iTunes to re-download it without making a new purchase. App'x 1292 at ¶ 62.

purchaser's ReDigi account may be a disincentive to the retention of sold files, it does not prevent the user from retaining sold files.

II.    Proceedings Below

On January 6, 2012, Plaintiffs brought this action, originally solely against ReDigi, Inc., alleging *inter alia*, that in the operation of ReDigi's system version 1.0, it infringed Plaintiffs' copyrights by unauthorized reproduction and distribution of Plaintiffs' copyrighted works. The parties cross-moved for summary judgment. On March 30, 2013, the district court granted partial summary judgment in Plaintiffs' favor finding infringement. Plaintiffs subsequently filed a first amended complaint, adding Ossenmacher and Rudolph as individual defendants. On November 2, 2015, the parties proposed a joint stipulation in which Ossenmacher and Rudolph waived their right to contest liability independent of ReDigi, Inc. On June 6, 2016, the district court entered a stipulated final judgment awarding damages to Plaintiffs in the amount of three million five hundred thousand dollars ($3,500,000) and permanently enjoining Defendants from operating the

ReDigi system.[7] In the stipulation, Defendants reserved the right to appeal solely from the district court's finding of liability for reproduction and distribution as set forth in the summary judgment order. Defendants timely filed notice of this appeal on July 1, 2016. On August 11, 2016, the appeal was stayed as a result of the Defendants' bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of Florida. The stay was lifted on December 12, 2016.

DISCUSSION

I.     The First Sale Doctrine

The primary issue on appeal is whether ReDigi's system version 1.0 lawfully enables resales of its users' digital files. Sections 106(1) and (3) of the Copyright Act respectively grant the owner of a copyright the exclusive right

---

[7] Notwithstanding that the operative complaint addressed only ReDigi's system version 1.0 (making no mention of version 2.0, which ReDigi launched on June 11, 2012), and the record before the district court did not address version 2.0, the stipulated judgment is binding as to version 2.0 against defendants and persons in specified relationships with ReDigi, as explained *supra* in footnote 2. Because neither we, nor the district court, have decided whether version 2.0 would infringe, this opinion does not decide on the lawfulness of the use—by persons who are independent of the Defendants—of systems functioning like version 2.0, at least to the extent that their systems differ from the aspects of version 1.0 that are adjudicated in this opinion.

11

to control the reproduction and the distribution of the copyrighted work.[8] 17 U.S.C. § 106(1) & (3). Under the first sale doctrine, codified in § 109(a), the rights holder's control *over the distribution* of any particular copy or phonorecord that was lawfully made effectively terminates when that copy or phonorecord is distributed to its first recipient. Section 109(a) provides:

> "Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord."

17 U.S.C. § 109(a).

Under this provision, it is well established that the lawful purchaser of a copy of a book is free to resell, lend, give, or otherwise transfer that copy without violating the copyright holder's exclusive right of distribution. The copy so resold or re-transferred may be re-transferred again and again without violating the exclusive distribution right. *See Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 530 (2013); *Quality King Distribs. v. L'Anza Research Int'l, Inc.*, 523 U.S. 135, 152 (1998); *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 351

---

[8] "Subject to sections 107 through 122, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work in copies or phonorecords . . . [and] (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending . . . ." 17 U.S.C. § 106(1), (3).

(1908); *see also* 4 Patry on Copyright § 13:15 ("Placing a lawful copy of a work in commerce exhausts the distribution and display rights with respect to that particular copy . . . ."). It is undisputed that one who owns a digital file from iTunes of music that is fixed in a material object qualifies as "the owner of a particular . . . phonorecord lawfully made," 17 U.S.C. § 109(a), and is thus entitled under § 109(a) "to sell or otherwise dispose of the possession of *that* . . . phonorecord," *id*. (emphasis added), without violating § 106(3). On the other hand, § 109(a) says nothing about the rights holder's control under § 106(1) over *reproduction* of a copy or phonorecord.

The district court found that resales through ReDigi were infringing for two reasons. The first reason was that, in the course of ReDigi's transfer, the phonorecord has been reproduced in a manner that violates the Plaintiffs' exclusive control of *reproduction* under § 106(1); the second was that the digital files sold through ReDigi, being unlawful reproductions, are not subject to the resale right established by § 109(a), which applies solely to a "particular . . . phonorecord . . . lawfully made." 17 U.S.C. § 109(a). We agree with the first reason underlying the district court's finding of infringement.

13

As that is a sufficient reason for affirmance of the judgment, we make no ruling on the district court's second reason.

ReDigi argues on appeal that its system effectuates transfer of the *particular* digital file that the user lawfully purchased from iTunes, that it should not be deemed to have reproduced that file, and that it should therefore come within the protection of 17 U.S.C. § 109(a). ReDigi makes two primary contentions in support of these arguments.

First, ReDigi asserts—as it must for its first sale argument to succeed— that the digital files should be considered "material objects" and therefore, under 17 U.S.C. § 101's definition of "phonorecords" as "material objects," should qualify as "phonorecords" eligible for the protection of § 109(a).

Second, ReDigi argues that from a technical standpoint, its process should not be seen as making a reproduction. ReDigi emphasizes that its system simultaneously "causes [packets] to be removed from the . . . file remaining in the consumer's computer" as those packets are copied into the computer buffer and then transferred to the ReDigi server, Appellants Br. 24, so that the complete file never exists in more than one place at the same time, and the "file on the user's machine continually shrinks in size while the file

14

on the server grows in size." App'x 691.[9] ReDigi points out that the "sum of the size of the data" stored in the original purchaser's computer and in ReDigi's server never exceeds the "size of the original file," which, according to ReDigi, "confirms that no reproductions are made during the transfer process." Appellants Br. 25.

As for ReDigi's first argument, that the digital file it transfers is a phonorecord protected by § 109(a), we do not decide this issue because we find that ReDigi effectuates an unlawful reproduction even if the digital file itself qualifies as a phonorecord.[10]

As for ReDigi's second argument, we reject it for the following reasons. The Copyright Act defines phonorecords as "material objects in which sounds . . . are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101. Accordingly, when the purchaser of a digital music file from iTunes possesses that file,

[9] From October 13, 2011 until March 2012, ReDigi's system sometimes made temporary archival copies that were deleted as soon as the migration process was complete. Those backup files have not been put at issue in this appeal.
[10] A conclusion that a digital file cannot be a phonorecord would have decisive implications for a system functioning like ReDigi's version 2.0, as well as its version 1.0. Because our understanding of the technology is limited, as is our ability to appreciate the economic implications, we find it preferable to rule more narrowly.

15

embodied "for a period of more than transitory duration" in a computer or other physical storage device, *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 127 (2d Cir. 2008) (quoting 17 U.S.C. § 101), that device—or at least the portion of it in which the digital music file is fixed (*e.g.*, the location on the hard drive)—becomes a phonorecord. *See London-Sire Records, Inc. v. Doe*, 542 F. Supp. 2d 153, 171 (D. Mass. 2008) (holding that the segment of a hard disc on which an electronic music file is encoded is a "phonorecord" under the Copyright Act). In the course of transferring a digital music file from an original purchaser's computer, through ReDigi, to a new purchaser, the digital file is first received and stored on ReDigi's server and then, at the new purchaser's option, may also be subsequently received and stored on the new purchaser's device.[11] At each of these steps, the digital file is fixed in a new material object "for a period of more than transitory duration." *Cartoon Network*, 536 F.3d at 127. The fixing of the digital file in ReDigi's server, as well as in the new purchaser's device, creates a new phonorecord, which is a reproduction. ReDigi version 1.0's process for enabling the resale of digital files thus inevitably involves the creation of new phonorecords by

---

[11] The new purchaser at his option may alternatively choose to leave the digital file in the new purchaser's storage locker on ReDigi's server and stream it for access.

reproduction, even if the standalone digital file is deemed to be a phonorecord.

As for the argument that, as ReDigi copies a packet of data, it deletes the equivalent packet in the user's device so that the amount of data extant in the transfer process remains constant, this does not rebut or nullify the fact that the eventual receipt and storage of that file in ReDigi's server, as well as in the new purchaser's device (at his option), does involve the making of new phonorecords. Unless the creation of those new phonorecords is justified by the doctrine of fair use, which we discuss and reject in a later portion of this opinion, the creation of such new phonorecords involves unauthorized reproduction, which is not protected, or even addressed, by § 109(a).

ReDigi makes several additional arguments designed to characterize its process as involving the transfer of its users' lawfully made phonorecords, rather than the creation of new phonorecords. None of these arguments negates the crucial fact that each transfer of a digital music file to ReDigi's server and each new purchaser's download of a digital music file to his device creates new phonorecords. ReDigi argues, for example, that during a transfer through ReDigi's data migration technology, each packet of data from the

17

original source file resides in a buffer "for less than a second" before being overwritten, Appellants Br. 27, and thus fails to satisfy the requirement that a sound recording must be embodied "for a period of more than transitory duration" to qualify as a phonorecord, 17 U.S.C. § 101; *Cartoon Network*, 536 F.3d at 127. Even if, during transfer, ReDigi's system retains each digital file *in a computer buffer* for a period of no more than transitory duration, those files subsequently become embodied in ReDigi's server and in the new purchaser's device, where they remain for periods "of more than transitory duration." *Cartoon Network*, 536 F.3d at 127. ReDigi's server and the resale purchaser's device on which the digital music files are fixed constitute or contain new phonorecords under the statute.

ReDigi next argues that, in the course of transferring a user's file to ReDigi's own server, and to the resale purchaser's device, ReDigi sees to it that all of the original purchaser's preexisting duplicates are destroyed. As an initial matter, as noted above, ReDigi here overclaims. It does not ensure against retention of duplicate phonorecords created by the original owner. ReDigi's assertion that "there is never an instance when [an] Eligible File could exist in more than one place or be accessed by more than one user" is

simply not supported by ReDigi's own evidence. Def. 56.1 Statement, App'x 1490. In addition, even if ReDigi effectively compensated (by offsetting deletions) for the making of unauthorized reproductions in violation of the rights holder's exclusive reproduction right under § 106(1), nonetheless ReDigi's process itself involves the making of unauthorized reproductions that infringe the exclusive reproduction right unless justified under fair use.[12] We are not free to disregard the terms of the statute merely because the entity performing an unauthorized reproduction makes efforts to nullify its consequences by the counterbalancing destruction of the preexisting phonorecords.

ReDigi further argues, citing *ABKCO Music, Inc. v. Stellar Records, Inc.*, 96 F.3d 60 (2d Cir. 1996), that the computer hard drive into which the original purchaser's digital file is embedded cannot be her lawfully made phonorecord. A computer hard drive, ReDigi argues, cannot qualify as a

---

[12] We recognize that the use of computers with digital files of protected matter will often result in the creation of innocuous copies which we would be loath to consider infringements because doing so would effectively bar society from using invaluable computer technology in relation to protected works. We believe this precedent will not have that undesirable effect for reasons discussed below in the section on fair use. What we consider here is that the making of unauthorized reproductions *in pursuit of an objective to distribute protected matter in competition with the rights holder*. The production of innocuous, unauthorized reproductions through the unavoidable function of a computer, when done for purposes that do not involve competing with the rights holder in its exclusive market, is outside the scope of this dispute.

phonorecord under § 101 because it contains more than a sound recording.

This argument misinterprets *ABKCO*. We held in *ABKCO* that a license to publish a phonorecord did not authorize the publication of compact discs for use in karaoke that contained both sound recordings and visual depictions of song lyrics. 96 F.3d at 64. The *ABKCO* opinion undertook to construe the breadth of a compulsory license. The opinion does not support the conclusion that a compact disc that stores visual depictions of words as well as recorded music does not *contain* a phonorecord. To be sure, a license to distribute phonorecords of a particular song would not by its terms authorize the distribution of whatever other copyrighted content is contained in a computer hard drive that also contains the recording of the song. But it does not follow that a device or other "material object[] in which sounds . . . are fixed . . . and from which the sounds can be perceived, reproduced, or otherwise communicated," 17 U.S.C. § 101, is not a phonorecord, merely because it contains other matter as well. We reject ReDigi's argument.[13]

---

[13] ReDigi also draws our attention to the Ninth Circuit's decision in *Recording Industry Association of America v. Diamond Multimedia Systems, Inc.*, 180 F.3d 1072 (9th Cir. 1999). In *Diamond*, the Ninth Circuit held that "a hard drive is excluded from the definition of digital music recordings" under the Audio Home Recording Act ("AHRA") because § 1001(5)(B) expressly provides that a "digital music recording" does *not* include material objects "in which one or more computer programs are fixed," and "a hard drive is a material object in which one or more [computer] programs are fixed." *Id*. at

Finally, ReDigi argues that the district court's conclusion makes no sense because it would "require a customer to sell her [valuable] computer in order to be able to sell a[n] . . . iTunes music file" that was lawfully purchased for under $1.00. Appellants Br. 28. Of course it would make no economic sense for a customer to sell her computer or even a $5.00 thumb drive in order to sell "a[n] . . . iTunes music file" purchased for $1.00. But ReDigi far overstates its economic argument when it asserts that the "district court's ruling . . . eliminat[es] any meaningful competition from resellers" as "no secondary market . . . can ever develop if consumers are required to give away their computer hard disks as part of any resale." Appellants Br. 35. A secondary market can readily be imagined for first purchasers who cost-effectively place 50 or 100 (or more) songs on an inexpensive device such as a thumb drive and sell it. *See* U.S. Copyright Office, Library of Cong., Digital Millennium Copyright Act § 104 Report 78 (2001) ("DMCA Report 2001") ("Physical copies of works in a digital format, such as CDs or DVDs, are subject to section 109 in the same way as physical copies of works in analog

---

1076. Even if we were to accept the Ninth Circuit's construction of the term "digital music recording" under the AHRA, that would not alter the meaning of the term "phonorecord" under § 101 of the Copyright Act. *See id*. at 1077 n.4.

21

form."); 4 Patry on Copyright § 13:23 (observing that § 109 permits the sale of an iPod that contains lawfully made digital music files). Furthermore, other technology may exist or be developed that could lawfully effectuate a digital first sale.

We conclude that the operation of ReDigi version 1.0 in effectuating a resale results in the making of at least one unauthorized reproduction. Unauthorized reproduction is not protected by § 109(a). It violates the rights holder's exclusive reproduction rights under § 106(1) unless excused as fair use. For reasons explained below, we conclude that the making of such reproductions is not a fair use.

Our conclusion is supported by the fact that the Copyright Office also concluded that the resale of digital files is infringing. In 1998, Congress mandated that the Register of Copyrights evaluate "the relationship between existing and emergent technology and the operation of section[] 109 . . . ." Digital Millennium Copyright Act, Pub. L. No. 105-304, 112 Stat. 2860, 2876 (1998). The Copyright Office conducted a multi-year evaluation, including review of comments and testimony from the public, academia, libraries, copyright organizations and copyright owners. DMCA Report 2001 at vi. The

Register concluded that § 109 does not apply to otherwise unauthorized digital transmissions of a copyrighted work, reasoning that such transmissions cause the recipient to obtain a new copy of the work. *Id.* at 79-80. The Register reasoned that the creation of a new copy of the work would constitute an unauthorized reproduction falling outside the authorization of § 109(a). *Id.*; *see also* 2 Nimmer on Copyright § 8.13[A] (describing the Register's "recommend[ation] against amending the Copyright Act to facilitate a digital *first sale*").

ReDigi argues that the Register's 2001 report is obsolete because it presumed that the only way to transfer digital files over the Internet was by the traditional "copy and delete" method, whereas new technologies either have been or might be developed that transfer digital files over the Internet using a non-infringing method. Plaintiffs counter that, in 2016, the Register again asserted that "a digital file transfer creates a new copy or phonorecord on the transferee's computer" and thus does not qualify for first sale protection. U.S. Copyright Office, Library of Cong., The Making Available Right in the United States 22, n.94 (2016) (quoting the district court's decision in this action with approval). We need not pronounce upon the ongoing

23

relevance of the Register's 2001 report, or decide whether *all* digital file transmissions over the Internet make reproductions, to determine that ReDigi's system version 1.0 does so.[14]

## II.    <u>Fair Use</u>

ReDigi argues that, regardless of whether what it does is protected by § 109(a), its actions are protected under the doctrine of fair use. We evaluate ReDigi's claim in accordance with the fair use statute. Section 107 of the Copyright Act provides:

> [T]he fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

---

[14] Having rejected ReDigi's arguments for the reasons explained above, we have no need to consider whether an electronic digital music file, independent of any physical storage device in which the file is fixed, can qualify as a phonorecord in view of § 101's definition of phonorecords as "material objects." 17 U.S.C. §101.

(4) the effect of the use upon the potential market for or value of
the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of
fair use if such finding is made upon consideration of all the above
factors.

17 U.S.C. § 107.

ReDigi's argument for fair use in its opening brief did not address the statutory factors. Nonetheless, we consider each in turn.

*A.      Factor One*

Factor One considers "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." § 107(1). The Supreme Court has observed that this factor favors secondary uses that are transformative, meaning that the use "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message[,]" rather than merely superseding the original work. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994). Uses that criticize, comment on, provide information about, or provide new uses for the copyrighted work are those likely to be deemed transformative. *See, e.g., Campbell*, 510 U.S. at 580-81 ("Parody needs to mimic

25

an original to make its point, and so has some claim to use the creation of its victim's . . . imagination, whereas satire can stand on its own two feet and so requires justification for the very act of borrowing.") (internal citations and footnote omitted). Similarly, a secondary use may be transformative if it provides information about the original, "or expands its utility." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015) ("Google Books"). Examples of such utility-expanding transformative fair uses have included scanning books to create a full-text searchable database and public search function (in a manner that did not allow users to read the texts), *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97-98 (2d Cir. 2014); copying works into a database used to detect plagiarism, *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009); displaying tiny, low-resolution "thumbnail" reproductions of art works to provide links serving as Internet pathways to the appropriate websites containing the originals, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818-19 (9th Cir. 2003), and copying by one who has acquired the right to view the content of a telecast to enable a single, non-commercial home viewing at a more convenient time, *Sony Corp. of Am. v.*

*Universal City Studios, Inc.*, 464 U.S. 417, 421, 448-55 (1984). In *Sony*, the "apparent reasoning was that a secondary use may be a fair use if it utilizes technology to achieve the transformative purpose of improving the efficiency of delivering content without unreasonably encroaching on the commercial entitlements of the rights holder" because the improved delivery was to one entitled to receive the content. *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 177 (2d Cir. 2018).

ReDigi makes no change in the copyrighted work. It provides neither criticism, commentary, nor information about it. Nor does it deliver the content in more convenient and usable form to one who has acquired an entitlement to receive the content. What ReDigi does is essentially to provide a market for the resale of digital music files, which resales compete with sales of the same recorded music by the rights holder. These characteristics of ReDigi's use favor Plaintiffs under Factor One.

In addition, while the mere fact of a commercial motivation rarely pushes the first factor determination against fair use (as so many of the canonical fair uses, such as book reviews; quotation of prominent figures in news reports, news commentary, and history books; the performance of

27

parodic plays; and the sale of parodic books, are all commercial, *see Google Books*, 804 F.3d at 219), in some circumstances a commercial motive will weigh against a finding of fair use under Factor One. As noted in *Campbell*, the less a use provides transformative value, the more its commercialism will weigh against a finding of fair use. *See* 510 U.S. at 579. Here, ReDigi hosts a remunerative marketplace that enables resale by purchasers of digital music files, which is a commercial purpose. Especially in view of the total absence (or at least very low degree) of transformative purpose, the commercial motivation here argues against ReDigi with respect to Factor One.

B.    *Factor Two*

The second fair use factor concerns "the nature of the copyrighted work." 17 U.S.C. § 107(2). Except to the extent that the nature of the copyrighted work is necessarily considered alongside the character and purpose of the secondary use in deciding whether the secondary use has a transformative purpose, it rarely, by itself, furnishes any substantial reasoning for favoring or disfavoring fair use. *See Google Books*, 804 F.3d at 220.  This case is no exception.

### C. Factor Three

The third factor considers "the amount and substantiality of the portion [of the original] used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). ReDigi's system makes identical copies of the whole of Plaintiffs' copyrighted sound recordings. Although use of the entirety of a digital file is not necessarily inconsistent with a finding of fair use, *see Google Books*, 804 F.3d at 221-22; *HathiTrust*, 755 F.3d at 98; *iParadigms*, 562 F.3d at 642; *Perfect 10*, 508 F.3d at 1165; *Arriba Soft*, 336 F.3d at 818-19, it tends to disfavor a finding of fair use.

### D. Factor Four

The fourth statutory factor is "the effect of the [copying] use upon the potential market for or value of the copyrighted work." § 107(4). When a secondary use competes in the rightsholder's market as an effective substitute for the original, it impedes the purpose of copyright to incentivize new creative works by enabling their creators to profit from them. For this reason, the Supreme Court in *Harper & Row Publishers, Inc. v. Nation Enterprises* described the fourth factor as "undoubtedly the single most important element of fair use." 471 U.S. 539, 566 (1985) (relying on the Nimmer

treatise).[15] Factor Four "focuses on whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original." *TVEyes*, 883 F.3d at 179 (quoting *Google Books*, 804 F.3d at 223). Factor Four is necessarily intertwined with Factor One; the more the objective of secondary use differs from that of the original, the less likely it will supplant the commercial market for the original. *See Google Books*, 804 F.3d at 223.

As Plaintiffs argue, ReDigi made reproductions of Plaintiffs' works for the purpose of resale in competition with the Plaintiffs' market for the sale of their sound recordings.[16] ReDigi's replicas were sold to the same consumers whose objective in purchasing was to acquire Plaintiffs' music. It is also of possible relevance that there is a distinction between ReDigi's resales and

---

[15] *Harper & Row* cited 3 Nimmer § 13.05[A]. *See* 4 Nimmer § 13:05[A] ("The fourth factor . . . emerges as the most important, and indeed, central fair use factor."). To be clear, a secondary use may seriously harm the value of the copyright for the quoted material and yet be a clear case of fair use, such as where a critic pans a new book, quoting passages to show its absurdity. *See* Pierre N. Leval, *Fair Use Rescued*, 44 UCLA L. Rev. 1449, 1459 (1997). In such circumstances, a secondary use's infliction of harm on the value of the copyright does not enlist the fourth factor against the copying use, as it would where the copying work offers a substitute for the original.

[16] To the extent a reproduction was made solely for cloud storage of the user's music on *ReDigi*'s server, and not to facilitate resale, the reproduction would likely be fair use just as the copying at issue in *Sony* was fair use.

resales of physical books and records. The digital files resold by ReDigi, although used, do not deteriorate the way printed books and physical records deteriorate. As the district court observed, the principal difference between the "product sold in ReDigi's secondary market" and that sold by Plaintiffs or their licensees in the primary market was its lower price. *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 654 (S.D.N.Y. 2013).

Factor Four weighs powerfully against fair use.

*E.      Factors Weighed Together Four*

The Supreme Court has instructed that, to ascertain whether there is fair use, all four of the statutory factors must be weighed together. *Campbell*, 510 U.S. at 577-78. Our consideration is informed by our recent holding in *TVEyes*, 883 F.3d at 175. TVEyes copied all televised video programming throughout the nation, together with its accompanying closed-captioned text, into a database. It offered a commercial subscription service through which business and professional clients could search the transcripts, receive a list of video segments that mentioned the searched terms, and then view up to ten minutes of each video segment. *Id.* Fox News Network, a producer of televised content, sued, claiming that TVEyes's distribution of Fox's

31

programming to TVEyes's subscribers infringed Fox's copyright. *Id*. We found that TVEyes's secondary use deployed modestly transformative technology (akin to the time shifting technology of *Sony*) in that "it enable[d] nearly instant access to a subset of material—and to information about the material—that would otherwise be irretrievable, or else retrievable only through prohibitively inconvenient or inefficient means." *Id.* at 177. As in *Sony*, it enabled its customers to view "programming they want at a time and place that is convenient to them, rather than at the time and place of broadcast." *Id.* at 177-78. Nonetheless, we held that TVEyes's use was not a fair use because it substantially competed with the rights holders' legitimate market. *Id.* at 180. By providing Fox's copyrighted programming to its clients "*without* payment to [the rights holder], TVEyes . . . usurped a market that properly belong[ed] to the copyright-holder." *Id.* (internal quotation marks and alteration omitted).

*TVEyes* is a substantial precedent for our holding here. The transformative purpose and character of TVEyes's use, while modest, was far more transformative than what ReDigi has shown here. TVEyes's transformative uses were nonetheless easily outweighed by the harm to the

32

rights holders' market considered under Factor Four. *Id.* at 181. Even if ReDigi is credited with some faint showing of a transformative purpose, that purpose is overwhelmed by the substantial harm ReDigi inflicts on the value of Plaintiffs' copyrights through its direct competition in the rights holders' legitimate market, offering consumers a substitute for purchasing from the rights holders. We find no fair use justification.

\*   \*   \*

We conclude by addressing policy-based arguments raised by ReDigi and its amici. They contend that ReDigi's version 1.0 ought to be validated as in compliance with § 109(a) because it allows for realization of an economically beneficial practice, originally authorized by the courts in the common law development of copyright, *see Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908), and later endorsed by Congress. They also contend that the Copyright Act must be read to vindicate purchasers' ability to alienate digital copyrighted works under the first sale doctrine—emphasizing that § 109(a) is styled as an entitlement rather than a defense to infringement—without regard to technological medium. *See* Copyright Law Professors Br. 4, 12, 14; *see also* Appellants Br. 38-41. On this score, they rely heavily on the breadth of

the common law first sale doctrine, and on a purported imperative, described as the "principle of technological neutrality" by amici and the "equal treatment principle" by ReDigi, not to disadvantage purchasers of digital copyrighted works, as compared with purchasers of physical copyrighted works. *See* Copyright Law Professors Br. 14; Appellants Br. 36-42.

As for whether the economic consequences of ReDigi's program are beneficial and further the objectives of copyright, we take no position. Courts are poorly equipped to assess the inevitably multifarious economic consequences that would result from such changes of law. So far as we can see, the establishment of ReDigi's resale marketplace would benefit some, especially purchasers of digital music, at the expense of others, especially rightsholders, who, in the sale of their merchandise, would have to compete with resellers of the same merchandise in digital form, which, although second hand, would, unlike second hand books and records, be as good as new.

Furthermore, as to the argument that we should read § 109(a) to accommodate digital resales because the first sale doctrine protects a fundamental entitlement, without regard to the terms of § 109(a) (and

34

incorporated definitions), we think such a ruling would exceed the proper exercise of the court's authority. The copyright statute is a patchwork, sometimes varying from clause to clause, as between provisions for which Congress has taken control, dictating both policy and the details of its execution, and provisions in which Congress approximatively summarized common law developments, implicitly leaving further such development to the courts. The paradigm of the latter category is § 107 on fair use. *See Campbell*, 510 U.S. at 577 ("Congress meant § 107 'to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way' and intended that courts continue the common-law tradition of fair use adjudication." (*quoting* H.R. Rep. No. 94–1476, 66 (1976)); *see also Google Books*, 804 F.3d at 213 ("[I]n passing the statute, Congress had no intention of normatively dictating fair use policy."). In the provisions here relevant, Congress dictated the terms of the statutory entitlements. Notwithstanding the purported breadth of the first sale doctrine as originally articulated by the courts, *see Bobbs-Merrill Co.*, 210 U.S. at 350 ("[T]he copyright statutes, while protecting the owner of the copyright in his right to multiply and sell his production, do not create the right to impose . . . a limitation at which the

book shall be sold at retail by future purchasers . . . ."); *Bureau of Nat'l Literature v. Sells*, 211 F. 379, 381-82 (W.D. Wash. 1914) (finding no infringement, in light of first sale doctrine, where reseller re-bound used books and held them out as new books), Congress, in promulgating § 109(a), adopted a narrower conception, which negates a claim of unauthorized *distribution* in violation of the author's exclusive right under § 106(3), but not a claim of unauthorized *reproduction* in violation of the exclusive right provided by § 106(1). If ReDigi and its champions have persuasive arguments in support of the change of law they advocate, it is Congress they should persuade. We reject the invitation to substitute our judgment for that of Congress.

CONCLUSION

We have considered ReDigi's remaining arguments against the district court's ruling and find them to be without merit. The judgment of the district court is AFFIRMED.